IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DANIEL WHIPPLE,

       Plaintiff,

              Civil Action No.
   v.           5:08-CV-1356 (GTS/DEP)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

       Defendant.

_____

APPEARANCES:        OF COUNSEL:

FOR PLAINTIFF:

OLINSKY & SHURTLIFF    JAYA A. SHURTLIFF, ESQ.
300 South State Street, Suite 520
Syracuse, New York 13202

FOR DEFENDANT:

HON. RICHARD S. HARTUNIAN   MICHELLE L. CHRIST, ESQ.
United States Attorney      Special Assistant U.S. Attorney
Northern District of New York
Post Office Box 7198      STEPHEN P. CONTE, ESQ.
100 South Clinton Street     Acting Chief Counsel - Region II
Syracuse, New York 13261-7198

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Daniel E. Whipple, who filed an application with the Social

Security Administration claiming to be disabled as a result of suffering from major depression with psychotic episodes and schizoaffective disorder and therefore requested disability insurance benefits, has commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's decision finding that he was not disabled at the relevant times, and accordingly is ineligible for the benefits sought.  In support of his request for review of the agency's determination plaintiff contends that the decision of the administrative law judge ("ALJ") assigned to hear and determine the matter, to the effect that he was not disabled at any relevant time, is flawed, arguing that 1) the ALJ's step one determination, finding that he was engaged in substantial gainful employment activity as of July 2007 and thus ineligible for benefits after that date, is erroneous and does not take into account the claimant's entitlement under the controlling regulations to engage in test work activities; 2)  the ALJ's residual functional capacity ("RFC") analysis, which forms the lynchpin of the disability determination, fails to properly consider his inability to understand and carry out simple job-related directions, and results from a failure to apply the controlling psychiatric review technique principles required in the event of a severe mental impairment; 3) the

ALJ's determination at step five of the relevant inquiry is improper, and the ALJ should have elicited testimony from a vocational expert to assist in that determination; and 4) the ALJ's assessment of plaintiff's credibility was both flawed and inadequately explained.

Having carefully reviewed the record now before the court in light of plaintiff's arguments, and applying the requisite deferential standard of review, I find that the Commissioner's determination resulted from the application of proper legal principles and is supported by substantial evidence.

I.    BACKGROUND

Plaintiff was born in August of 1961; at the time of the ALJ's decision in this matter, he was forty-six years old.[1]  AT 57, 306.  Plaintiff is married, and until relatively recently lived with his wife in a single family home.[2]  AT 84, 307, 311.  Plaintiff completed high school, and later

---

[1]     Portions of the administrative transcript (Dkt. No. 5), which was compiled by the Commissioner and is comprised in large part of the medical records and other evidence that was before the agency when it made its decision, will be cited hereinafter as "AT ___."

[2]     The medical treatment notes in the record reflect that during 2007 plaintiff experienced marital problems, learning that his wife had purchased a residence and was planning to move out of the marital home.  *See, e.g.,* AT 247, 292. By the time of the administrative hearing in this matter, conducted on January 7, 2008, plaintiff was living alone.  AT 307.

earned an Associates Degree in the field of Criminal Justice.  AT 74, 216, 307.

Plaintiff's vocational experiences have included working as a firefighter and a truck driver.  AT 69.  Plaintiff was employed as a firefighter for the City of Syracuse from June 1993 through March 2006, at which time he began to experience difficulties performing his duties and was required to leave work due to depression.[3]  AT 69, 217.

On May 9, 2005 plaintiff was admitted to Community General Hospital, where he was treated for depression and anxiety-related symptoms.[4]  AT 134-35.  When admitted, plaintiff appeared to be in a catatonic state marked by blank staring, and his wife reported that his behavior leading up to the time of his admission was rather bizarre.  *Id.* Although plaintiff denied any drug use, urine testing revealing the presence of opiates.  *Id.*  When confronted with the positive finding,

---

[3]     Despite not working for the fire department since March 2006, defendant remained on the City of Syracuse payroll until January 2007 and was considered during that period as being on leave while his retirement was pending.  AT 308-09. Plaintiff now receives disability pension payments from the City.  *Id.*

[4]     The discharge summary related to that admission reflects that plaintiff had previously presented at the hospital with similar symptoms on several occasions over the prior ten years.  AT 134.

4

Whipple attributed it to his wife having given him "Tylenol #3."[5]  AT 134.

Upon examination, Dr. Pemala Pradhan noted that plaintiff's psychomotor activity was slowed, his level of consciousness was hypervigilant, his productivity was extremely reduced, and his mood and affect were blunted.  AT 134.  She further noted that plaintiff's judgment and insight were limited to fair.  *Id.*  Dr. Pradhan assessed plaintiff's thought content as delusional, noting his belief that people in a courtroom were talking about him despite not having been to court.  AT 134, 146.  Plaintiff's global assessment of functioning ("GAF") was listed at thirty.[6]  AT 148, 152, 172.  At the time of his discharge from the hospital on May 13, 2005, plaintiff admitted that he was non-compliant with his medications and took them on a self-diagnosed, as-needed basis.  Dr. Pradhan diagnosed the plaintiff as suffering from psychotic disorder not otherwise

---

[5]     "Tylenol #3" combines acetaminophen and codeine, a narcotic alkaloid obtained from opium or prepared by methylating morphine.  *See* http://www.webmd.com/drugs/drug-3179-Tylenol-Codeine+3+Oral.aspx (site last visited March 4, 2011) (screen shot attached); DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 386 (31st ed. 2007).

[6]     The one-hundred point GAF scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health.  A GAF score of twenty-one to thirty indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas. . . ."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Am. Psychiatric Assoc. 4th ed. Text Rev. 2000).

specified ("NOS"), indicating that bipolar disorder should be ruled out.[7]  AT 135.

Following his hospitalization plaintiff returned to see Dr. Roger G. Levine, a psychiatrist with whom he had treated with in the past but not seen in five years.  AT 128-33, 247-52, 291-92.  Over the course of his treatment Dr. Levine has diagnosed the plaintiff as suffering from chronic schizoaffective disorder and psychotic disorder NOS, and has prescribed various medications including Ambien, Celexa, Cogentin, Risperdal, and Xanax.  Id.  By May 2006, plaintiff was diagnosed by Dr. Levine as being in "partial or unspecified remission", with a notation on May 4, 2006 that he was doing well and there was no reason why he could not at that point return to work, and with a similar observation on May 8, 2006.[8]  AT 130, 291.

In addition to his mental condition, plaintiff has been treated over time for various physical complaints such as light headedness and headaches, including by Dr. David C. Manfredi and Dr. Kumar

---

[7]     Dr. Pradhan has not seen the plaintiff since his discharge from Community General Hospital.

[8]     There is no explanation in the medical records as to why the May 4, 2004 visit, at the close of which the plan was that plaintiff would return in two weeks, was followed four days later by another visit to Dr. Levine.

Bhagavatula.  A consultative physical examination conducted on August 10, 2006 by Dr. Kalyani Ganesh, however, was generally unremarkable and yielded no evidence of any physical limitations due to those conditions, and plaintiff has not pressed those conditions, either in his application for benefits or in this appeal, as contributing to the limitations that preclude him from working.  *See* AT 222-23.

In addition to his treating mental health sources, plaintiff was seen consultatively by Dr. Kristen Barry, a New York State licensed psychologist, on August 10, 2006.  AT 216-20.  In notes of that session Dr. Barry reported that plaintiff seemed somewhat evasive throughout the evaluation, and did not readily disclose information.  AT 217.  In her report Dr. Barry provided the following medical source statement:

> [t]he claimant at this time is able to follow and understand simple directions and instructions.  He appears able to maintain his attention and concentration and is an intelligent individual who has been able to perform complex tasks independently and learn new tasks.  He states that he has had a problem with depression for several years.  He is not really sure why the depression started.  He had [sic] difficult time describing the depression.  He states that he gets withdrawn and indecisive.  He has been hospitalized approximately [six] times in the past [ten] years because of the depression.  He is in treatment and on several medications.  He appeared very blunted and restricted in his affect during the evaluation.  He had difficulty providing information which may be due to his severe depression.  The claimant may have difficulty in relating adequately with others and handling stressors at this time.

7

He also may have a difficult time making appropriate decisions.

AT 219.  Dr. Barry diagnosed plaintiff with anxiety disorder and depressive

disorder, both NOS, adding the need to rule out major depressive order

without psychotic features.  AT 219.  Dr. Barry characterized plaintiff's

prognosis as guarded and recommended that he continue with psychiatric

treatment.  *Id.*

In addition to the consultative evaluation by examining psychologist

Dr. Barry, plaintiff's medical records were reviewed by Dr. Thomas

Harding, a non-examining psychologist, who completed both a residual

functional capacity assessment and a psychiatric review technique for the

agency.  AT 225-42.  After having reviewed Dr. Levine's progress notes

dating back to the alleged onset date of plaintiff's disability, Dr. Harding

concluded that plaintiff's daily living capacity was at an adult independent

level.  AT 225.  Dr. Harding discerned moderate limitations in plaintiff's

ability to understand and remember detailed instructions; ability to carry

out detailed instructions, ability to maintain attention and concentration for

extended periods; ability to perform activities within a schedule; ability to

maintain regular attendance and be punctual within customary tolerances;

ability to work in coordination with or proximity to others without being

8

distracted; ability to complete a normal workday and work week without interruptions; ability to accept instructions and respond appropriately to criticism from supervisors, ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; ability to respond appropriately to changes in the work setting; and his ability to set realistic goals or make plans independently of others. AT 226-27.  Dr. Harding found no greater limitations, however, and concluded that in all other areas plaintiff was not significantly limited.  AT 226-27.

Based upon his review of the records, Dr. Harding opined that plaintiff suffers from psychosis NOS and depressive disorder.  AT 232-33. Addressing the area of functional limitations, Dr. Harding noted a mild degree of limitation with respect to plaintiff's activities of daily living and a moderate degree of limitation with respect to plaintiff's abilities to maintain social functioning and concentration, persistence, or pace.  AT 240.

In July 2007, apparently after his disability application with the City was addressed and resolved, plaintiff began working as a full-time truck driver for Bolus Freight System, a job he still held as of the date of the administrative hearing in this matter on July 17, 2008.[9]  AT 63, 111, 308-

---

[9]     Prior to taking on full-time employment in July 2007, plaintiff accepted a position driving a dump truck, but was let go after two days. AT 248.  Plaintiff's

09.  In that position plaintiff operates a tractor trailer on local runs, and is

required to lift up to fifty pounds on an occasional basis.  AT 308-09.

Plaintiff states that in addition to being able to lift up to fifty pounds, he can

walk for a mile before having to rest briefly, can stand for fifteen minutes

and sit for thirty minutes, and has no difficulty with handling finer objects.

AT 314.

II.    PROCEDURAL HISTORY

    A.    Proceedings Before the Agency

On June 13, 2006, plaintiff filed an application for disability

insurance benefits ("DIB"), alleging a disability onset date of March 31,

2006.  AT 57-59.  That application was denied on August 25, 2006.  AT

34-37.

At plaintiff's request an administrative hearing was conducted on

January 17, 2008 before ALJ Robert Gale to address plaintiff's disability

claim and corresponding application for benefits.  AT 303-18.  Following

that hearing, and based upon his *de novo* review of the available

evidence, ALJ Gale issued a decision on May 30, 2008 finding that

---

termination, however, appears to have resulted from problems unrelated to his mental
impairments, including having broken off  a mirror on the truck and a customer
complaint regarding his backing-up ability.  *Id.*

10

Whipple was not disabled within the meaning of the Act and therefore denying his application for benefits.  AT 21-30.  Applying the now familiar, five step test for determinating the issue of disability, ALJ Gale first found at step one that plaintiff had in fact engaged in substantial gainful activity ("SGA") since the alleged onset date of March 31, 2006, with posted earnings totaling $13,496.15.  AT 23.  The ALJ therefore found that plaintiff failed to establish one of the threshold requirements for establishing disability.  *Id.*

Notwithstanding his step one determination, which could have ended the disability inquiry, the ALJ proceeded to consider the available medical evidence and, at step two, concluded that plaintiff's anxiety and major depressive and/or schizoaffective disorder in remission sufficiently interfered with his ability to perform work-related activities as to qualify as severe at step two but, after carefully considering medical and consultative reports concerning plaintiff's mental condition, found at step three that plaintiff's impairment or combination of impairments did not meet or medically equal any of the listed, presumptively disabling impairments set forth in 20 C.F.R. Pt. 404, Subpt. P. App. 1.  AT 23-25.

Before proceeding to step four of the disability protocol, the ALJ

concluded that plaintiff retains the RFC to perform work at all exertional levels in a job involving simple tasks and allowing for a low stress environment.  AT 28.  Applying that RFC, ALJ Gale concluded at step four that plaintiff is unable to perform any of his past relevant work.  AT 28.

Proceeding to step five, and acknowledging the shifting of burdens to the Commissioner, *see* AT 23, the ALJ concluded, relying upon the medical-vocational guidelines (the "grid") set forth in 20 C.F.R. Pt. 404, subpt. P, App. 2, that there are jobs existing in sufficient numbers in the national economy that plaintiff is capable of performing, despite his limitations.  AT 29.  The ALJ therefore concluded that plaintiff was not disabled at the relevant times and is thus ineligible to receive disability benefits.  *Id.*

The ALJ's decision became a final determination of the agency on November 21, 2008, when the Social Security Administration Appeals Council denied his request for review of that opinion.  AT 5-7.

B.    This Action

Having exhausted his administrative remedies within the agency, plaintiff commenced this action on December 19, 2008.  Dkt. No. 1.  Issue was thereafter joined on March 26, 2009, by the Commissioner's filing of

an answer, Dkt. No. 7, preceded by the filing of a copy of an

administrative transcript of the evidence and proceedings before the

agency.  Dkt. No. 5.  With the filing of plaintiff's brief on July 13, 2009, Dkt.

No. 11, and that on behalf of the Commissioner on August 27, 2009, Dkt.

No. 14, the matter is now fully briefed and ripe for determination, and has

been referred to me for the issuance of a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York

Local Rule 72.3(d).  *See also* Fed. R. Civ. P. 72(b).[10]

III.   DISCUSSION

    A.   Scope of Review

    A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal*

---

[10]     This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998, and subsequently amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 12, 2003.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

*v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp.

2d 145, 148 (N.D.N.Y. 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 985

(2d Cir. 1987)).  Where there is reasonable doubt as to whether the

Commissioner applied the proper legal standards, his decision should not

be affirmed even though the ultimate conclusion reached is arguably

supported by substantial evidence.  *Martone*, 70 F. Supp. 2d at 148 (citing

*Johnson*, 817 F.2d at 986).  If, however, the ALJ has applied the correct

legal standards and substantial evidence supports the ALJ's findings,

those findings are conclusive, and the decision should withstand judicial

scrutiny regardless of whether the reviewing court might have reached a

contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586;

*Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13

F. Supp. 2d 312, 314 (N.D.N.Y. 1998); *see also* 42 U.S.C. § 405(g).

   The term "substantial evidence" has been defined as " 'such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion.' "  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420,

1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197,

229, 59 S. Ct. 206, 217 (1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184

(2d Cir. 2003).  To be substantial, there must be " 'more than a mere

scintilla' " of evidence scattered throughout the administrative record. *Richardson*, 402 U.S. at 401, 91 S. Ct. at 1427 (quoting *Consolidated Edison Co.*, 308 U.S. at 229, 59 S. Ct. at 217); *Martone*, 70 F. Supp. 2d at 148 (quoting *Richardson* ).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that an ALJ has applied incorrect legal standards, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp. 2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp. 2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted

if new, non-cumulative evidence proffered to the district court should be

considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and*

*Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand,

while unusual, is appropriate when there is "persuasive proof of disability"

in the record and it would serve no useful purpose to remand the matter

for further proceedings before the agency.  *Parker*, 626 F.2d at 235;

*Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir.1992);

*Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir.

1983).

     B.    <u>Disability Determination:  The Five Step Evaluation Process</u>

The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to

result in death or has lasted or can be expected to last for a continuous

period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In

addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of
> such severity that he is not only unable to do his previous work
> but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of
> whether such work exists in the immediate area in which he

lives, or whether a specific job vacancy exists for him, or
whether he would be hired if he applied for work.

*Id.* at § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

the claimant is engaging in substantial gainful activity; if so, then the

claimant is not disabled, and the inquiry need proceed no further.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully

employed, then the second step involves an examination of whether the

claimant has a severe impairment or combination of impairments which

significantly restricts his or her physical or mental ability to perform basic

work activities.  *Id.* at §§ 404.1520(c), 416.920(c).  If the claimant is found

to suffer from such an impairment, the agency must next determine at

step three whether it meets or equals an impairment listed in Appendix 1

of the regulations.  *Id.* at §§ 404.1520(d), 416.920(d); *see also id.* Part

404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled."

*Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582,

584 (2d Cir. 1984)); *Id.* at §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an

17

assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  *Id.* at §§ 404.1520(f), 416.920(f).  If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work.  20 C.F.R. §§ 404.1520(g), 416.920(g).

The burden of showing that the claimant cannot perform past work lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

    C.    <u>The Evidence In This Case</u>

        1.    <u>Substantial Gainful Activity</u>

Plaintiff contends that in ruling against him at step one of the sequential evaluation process, the ALJ failed to apply the appropriate legal standards.  Whipple submits that as of the time of the hearing he had worked at presumptive substantial gainful activity ("SGA") levels for

only six months, and argues that the ALJ should have evaluated his post-onset date work activity under 20 C.F.R. §§ 404.1592(a) (which allows for a trial work period),[11] 404.1592a (which provides for a reentitlement period),[12] and 404.1574(c)(1) (which addresses the situation of an

_____

[11]     20 C.F.R. § 404.1592(a) defines a trial work period as the

period during which [the claimant may test [his or her] ability to work and still be considered disabled.  It begins and ends as described in paragraph (e) of this section.  During this period, [the claimant] may perform services (see paragraph (b) of this section) in as many as [nine] months, but these months do not have to be consecutive.  [The Social Security Administration] will not consider those services as showing that [a claimant's] disability has ended until [he or she has] performed services in at least [nine] months.  However, after the trial work period has ended [the Social Security Administration] will consider the work [the claimant] did during the trial work period in determining whether [his or her] disability ended at any time after the trial work period.

[12]     20 C.F.R. § 404.1592a(a) provides, in relevant part, that

[t]he reentitlement period is an additional period after [nine] months of trial work during which [the claimant] may continue to test [his or her] ability to work if [he or she has] a disabling impairment, as defined in Sec. 404.1511. If [the claimant] work[s] during the reentitlement period, [the Social Security Administration] may decide that [the claimant's] disability has ceased because [the claimant's] work is substantial gainful activity and stop [the claimant's] benefits. However, if, after the month for which [the Social Security Administration] found that [the claimant's] disability ceased because [the claimant] performed substantial gainful activity, [the claimant] stop[s] engaging in substantial gainful activity, [the Social Security Administration] will start paying [the claimant] benefits again; [the claimant] will not have to file a new application.

19

"unsuccessful work attempt")[13].  Acknowledging that the ALJ did not base

his determination on his SGA finding but instead continued the sequential

evaluation beyond the step one determination, plaintiff nonetheless

appears to be arguing that the ALJ's failure to evaluate his work under

those regulations "could reasonably have prejudiced the remainder of the

evaluation."  The Commissioner counters that plaintiff's contention is

without merit and maintains that the ALJ properly found that plaintiff's

return to full-time work in July 2007 constituted SGA, precluding his

recovery of benefits after that date.

     The ALJ found that plaintiff has returned to substantial gainful

activity since his alleged onset date.  Generally, if a claimant has earnings

from employment or self-employment above a specific level set by the

agency, it is presumed that he or she has demonstrated the ability to

---

[13]     Under 20 C.F.R. § 404.1574(c)(1),

         [o]rdinarily, work [the claimant] ha[s] done will not
         show that [the claimant is] able to do substantial
         gainful activity if, after working for a period of [six]
         months or less, [the claimant's] impairment forced
         [him or her] to stop working or to reduce the amount
         of work [he or she] do[es] so that [his or her]
         earnings from such work fall below the substantial
         gainful activity earnings level.

engage in substantial gainful activity.[14]  *See* 20 CFR §§ 404.1574,

404.1575, 416.974, and 416.975.  If a claimant engages in substantial

gainful activity, he or she is not disabled regardless of how severe his or

her physical or mental impairments are and notwithstanding his or her

age, education, and work experience.  *See Matatesta v. Astrue*, No. 1:07-

cv-1219, 2010 WL 3724033, at *2 (N.D.N.Y. Sept. 15, 2010) (Sharpe, J.);

*Wonica v. Sec'y of Dep't of Heath and Human Serv.*, 792 F. Supp. 8

(E.D.N.Y. 1998).

In determining whether a claimant has engaged in SGA, the

regulations prescribe several factors to be considered, including 1)

whether earnings have been derived from work activity; 2) the amount of

the earnings; 3) whether the work is in a sheltered or special environment;

4) any unsuccessful work attempts – that is, work periods of six months or

less due to the impairment; and 5) whether the work activity falls under

certain volunteer programs.  20 C.F.R. §§ 404.1574(a)-(d).  The

---

[14]     The Social Security Administration has specified that for non-blind disability, in 2007 monthly earnings averaging $900 or more constituted substantial gainful activity.  *See* http://www.ssa.gov/OACT/COLA/sga.html (site last visited March 4, 2011) (screen shot attached).  The ALJ noted that plaintiff's earnings record showed posted income for 2007 in the amount of $13,496.15.  AT 23. Plaintiff's 2007 income equates to average monthly earnings of approximately $1,124.68, and thus exceeded the specified threshold minimum.

Commissioner's regulations also provide that if a claimant has worked more than six months at the substantial gainful activity level, the claimant's work cannot be considered an unsuccessful work attempt regardless of the reasons for its ending, or why earnings were subsequently reduced below the substantial gainful activity level.  *See* 20 C.F.R. § 404.1574(c)(5).

In this instance, plaintiff returned to work in July 2007, apparently with the approval of his treating psychiatrist, Dr. Levine, and continued in that position at least through January of 2008, when the administrative hearing in this matter was conducted.  There is no indication in the record that this was a trial period, and even if so, nothing suggests that the trial was unsuccessful and that plaintiff was not able to fully engage in his work as a truck driver as a result of his disability.  Accordingly, the Commissioner correctly determined that as of July 2007 plaintiff was no longer disabled, and went on to address the other four steps of the sequential analysis with a particular emphasis on the period from the alleged disability onset date of March 31, 2006 until July 2007.[15]  In short,

---

[15]     Contrary to implications from plaintiff's brief, there is no indication that the ALJ's step one analysis, even if flawed, infected or in anyway tainted his analysis of the remaining portions of the disability calculus.

I find no reason to recommend that the ALJ's determination at step one of the five step test be disturbed.

### 2.   Evaluation of Mental Impairments and Plaintiff's RFC

Plaintiff next contends that the ALJ failed to apply the appropriate legal standards, and specifically those detailed in Social Security Ruling ("SSR") 85-15 and 20 C.F.R. § 404.1520a, when evaluating the limitations imposed by his mental impairments.  He argues that the ALJ did not consider the basic mental demands of unskilled work, and failed to apply the required psychiatric review technique.  Whipple further contends that the ALJ's RFC finding is not supported by substantial evidence.  The Commissioner counters that the ALJ specifically evaluated plaintiff utilizing the psychiatric review technique discussed in 20 C.F.R. § 404.1520a, and explicitly set forth his resulting findings.  The Commissioner further maintains that substantial evidence supports the ALJ's RFC determination.

### a.   Special Technique

When considering a mental impairment at the second and third steps of the sequential analysis, an ALJ must apply a "special technique" set forth in 20 C.F.R. §§ 404.1520a(a) and 416.920a(a) to determine

whether it is severe.  *Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008) (citation omitted).  The prescribed analysis requires that the ALJ first consider whether the claimant has a medically determinable impairment, and that he or she rate the degree of claimant's functional limitation resulting from the impairment in four areas, including 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation."[16]  20 C.F.R. §§ 404.1520a(c)(3); 416.920a(c)(3).  These areas are rated on a scale of "none, mild, moderate, marked, and extreme."  20 C.F.R. §§ 404.1520a(c)(4); 416 .920a(c)(4).  Generally, if the degree of limitation in the first three areas is mild or none and there are no episodes of decompensation, then the impairment is not severe.  *See* 20 C.F.R. § 1520a(d)(1).  If the claimant's mental impairment is severe, the ALJ must next determine whether the impairment meets or is equivalent in severity to any listed mental disorder. *Kohler*, 546 F.3d at 266.  If so, the claimant will be found to be disabled; otherwise, the ALJ must next assess the claimant's RFC.  20 C.F.R. §

---

[16]   "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Kohler*, 546 F.3d at 266 n.5 (citation omitted).

404.1520a(d)(3).  An ALJ's failure to apply the special technique

constitutes a ground for remand, in the absence a finding of harmless

error.  *See O'Connell v. Astrue*, No. 1:06-cv-1113, 2009 WL 606155, at

*21 (N.D.N.Y. Mar. 9, 2009) (Kahn, J.) (citing *Kohler*, 546 F.3d at 267-69,

n.9 and explaining that although the Second Circuit found that failure

apply the special technique was legal error, it had left open the possibility

that an ALJ's failure to apply the special technique would be harmless

error, as when, they suggested, "an ALJ actually complied with the special

technique by making determinations regarding a [claimant's] degree of

limitation . . . but merely fail[ed] to strictly comply with the documentation

requirement . . . .").

In this case, the ALJ recognized and applied the special technique,

finding that the evidence persuasively supported the conclusion

> that prior to the [plaintiff's] having returned to work and for a
> brief period of time, he had [a] mild restriction of activities of
> daily living, moderate difficulties in maintaining social
> functioning and moderate difficulties in maintaining
> concentration persistence or pace . . . with one reported
> episode of decompensation.

AT 25.[17]   The ALJ properly continued his analysis by finding that although

---

[17]     Relatedly, the ALJ also noted that treatment and medication adequately
controlled plaintiff's symptoms of decreased attention and concentration.  AT 25; *see*
AT 83, 130, 131, 249, 252.

plaintiff's anxiety and major depressive and/or schizoaffective disorder in remission were severe impairments, they did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, and thus failed to meet the "B" criteria of Listings 12.03, 12.04 and/or 12.06 .  AT 25.  The ALJ further found that the evidence failed to meet the "C" criteria of those Listings.  AT 26.

ALJ Gale therefore properly incorporated the prescribed psychiatric review technique into his findings, which are supported by substantial evidence, and correctly concluded that plaintiff's mental condition did not meet or equal any of the relevant, listed mental impairments.

b.    RFC

After applying the required psychiatric analysis and examining whether plaintiff's condition meets or equals any of the listings, ALJ Gale went on to determine the plaintiff's RFC.  A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue.  20 C.F.R. §§ 404.1545(a), 416.945(a).  An RFC determination is informed by consideration of a claimant's physical and mental abilities, symptomology, including subjective allegations of pain, and other limitations that could interfere with

work activities on a regular and continuing basis.  *Id.*; *Martone*, 70 F.

Supp. 2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore

assess his or her exertional capabilities, addressing the ability to sit,

stand, walk, lift, carry, push, and pull.  20 C.F.R. §§ 404.1545(b),

404.1569a.  The ALJ must also consider nonexertional limitations or

impairments, including impairments that result in postural and

manipulative limitations.  20 C.F.R. §§ 404 .1545(b), 404.1569a; *see also*

20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  Furthermore, in the

event a mental impairment is deemed severe, but does not meet or equal

a listed mental disorder, the Commissioner considers whether a claimant

is limited in the ability to carry out certain mental activities–such as

limitations in understanding, remembering, and carrying out instructions,

and in responding appropriately to supervision, co-workers, and work

pressures in a work setting–to such a degree as to reduce his or her

ability to do past relevant work and other work.  *See* 20 C.F.R. §§

404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c).  When making

an RFC determination, an ALJ must specify those functions that the

claimant is capable of performing; conclusory statements concerning his

or her capabilities, however, will not suffice.  *Martone*, 70 F. Supp. 2d at

150 (citing *Ferraris*, 728 F.2d at 587).  An administrative RFC finding can

withstand judicial scrutiny only if there is substantial evidence in the record

to support each requirement listed in the regulations.  *Martone*, 70 F.

Supp. 2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183

(N.D.N.Y.1990)); *Sobolewski v. Apfel*, 985 F. Supp. 300, 309-10 (E.D.N.Y.

1997).

    In this instance, the ALJ noted that the RFC determination employed

at the fourth and fifth steps of the sequential evaluation required an

assessment itemizing various functions contained in the broad categories

of the "B" and "C" criteria, and explained that he had extrapolated that

criteria into work-related functions implicated in the RFC determination.

AT 26.  The ALJ found that despite his condition plaintiff has the RFC to

perform a full range of work at all exertional levels in a job with tasks that

allow for a low stress environment, presenting only occasional work

setting changes and requiring only occasional decision making.  AT 26.

    The ALJ's RFC determination finds considerable support in the

record.  The ALJ relied heavily on the opinion of plaintiff's treating

psychiatrist, Dr. Levine.  The ALJ noted that in May 2006 – less than two

months after plaintiff's alleged onset date – Dr. Levine opined that plaintiff

was "pretty much back to baseline" and found no reason why plaintiff

could not return to work.  AT 24, 27; *see* AT 130, 291.  The ALJ also

noted that Whipple's father, who accompanied him to an appointment with

Dr. Levine in May 2006, felt that plaintiff was doing well.  AT 27; *see* AT

291.  The ALJ further observed that in November of 2007 Dr. Levine

opined that plaintiff was "doing pretty well" and found no evidence of

paranoia or depression.  AT 27; *see* AT 292.  Dr. Levine's treatment notes

support his opinion; he consistently reported that plaintiff was doing

"okay," "well", or had returned to baseline,  AT 128, 129, 130, 247, 249,

250, 252, and found no evidence of depression or psychosis.  AT 128,

129, 248, 249, 250, 251.

The ALJ also accorded significant weight to Dr. Harding's opinion

that plaintiff's psychosis disorder and depressive disorder result in only a

mild restriction of activities of daily living, moderate difficulties in

maintaining social functioning, and moderate difficulties in maintaining

concentration, persistence, or pace, with insufficient evidence of episodes

of deterioration.  AT 24, 27; *see* AT 240.  It is well-settled that an ALJ is

entitled to rely upon the opinions of state agency medical and

psychological consultants, since they are deemed to be qualified experts

in the field of social security disability.  *See* 20 C.F.R. §§ 404.1512(b)(6),

404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), 416.927(f)(2).

Such reliance is particularly appropriate where, as here, the weight of the

evidence of record supports the opinion of the State agency psychologist.

*See Diaz v. Shalala*, 59 F.3d 307, 31 n.5 (2d Cir. 1995); *Provost-Harvey v.

Comm'r of Soc. Sec.*, No. 1:06-CV-1128, 2008 WL 697366, at *6

(McAvoy, S.J.) (N.D.N.Y. Mar. 13, 2008) ("The evaluations of

non-examining State agency medical and psychological consultants may

constitute substantial evidence.").

It should be noted that when making his RFC findings the ALJ

considered the consultative opinions of Dr. Barry, which are slightly at

odds with his conclusions.  The ALJ accorded Dr. Barry's opinion only

"limited weight" because it was based upon a single evaluation and was

inconsistent with Dr. Levine's well-supported opinions and the extent of

plaintiff's daily activities, noting Dr. Barry's observation that plaintiff was

evasive throughout her evaluation and her conclusion that despite his

mental impairments plaintiff is able to perform simple tasks and maintain

attention and concentration, although he may have difficulty in relating to

others and providing information.  AT 24, 27; *see* AT 219.

In sum, I find that the ALJ's RFC determination is supported by

substantial evidence.

### 3.   Vocational Expert

Plaintiff next argues that because his limitations are solely

nonexertional, the ALJ improperly resorted to the grid in order to ascertain

the availability of suitable work for the plaintiff, and should instead have

requested input from a vocational expert for that purpose.  The

Commissioner responds by  maintaining that the ALJ's reliance on the grid

was proper and consistent with the Commissioner's regulations and

rulings, as well as applicable Second Circuit authority.

The medical-vocational guidelines

take[ ] into account the claimant's [RFC] in conjunction with
the claimant's age, education and work experience. Based on
these factors, the Grid indicates whether the claimant can
engage in any other substantial gainful work which exists in
the national economy.  Generally the result listed in the Grid is
dispositive on the issue of disability.

*Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).  The grid

"divides work into sedentary, light, medium, heavy and very heavy, based

on the extent of requirements in the primary strength activities of sitting,

standing, walking, lifting, carrying, pushing, and pulling."  *Id.* at 667 n. 2;

*see* 20 C.F.R. § 404.1567(a).  Upon consideration of the claimant's RFC, age, education, and prior work experience, the grid yields a decision of either "disabled" or "not disabled."  20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines."  *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).  Rather, exclusive reliance on the grid will only be deemed inappropriate where the non-exertional impairments "*significantly* limit the range of work permitted by [the claimant's] exertional limitations."  *Id.* at 605-06 (emphasis added).  "A claimant's work capacity is 'significantly diminished' if there is an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.' "  *Bapp*, 802 F.2d at 606.

In this case, the ALJ properly considered whether the grid was applicable for use as a framework to determine the question of disability. Appropriately relying upon SSR 85-15, the ALJ noted the importance of

32

assessing whether plaintiff had a significant limitation in his ability to

understand, remember and carry out simple job instructions, respond to

supervisors, co-workers and usual work situations, deal with changes in a

routine work setting, and maintain attention and concentration.  AT 29

(citing SSR 85-15).  He found that plaintiff's ability

> to perform work at all exertional levels has not been
> compromised by nonexertional limitations.  The evidence
> supports a conclusion that these nonexertional limitations have
> little or no effect on the occupational base of unskilled work at
> all exertional levels, as demonstrated by [plaintiff's] ability to
> maintain gainful employment since July 2007 with little and/or
> no change in his condition since he was released to return to
> work in May 2006.

AT 29.  Under these circumstances, it was not improper for ALJ to resort

to the grid for use as a framework in determining the issue of disability.

### 4.   Plaintiff's Credibility

In his next and final point, plaintiff contends that the ALJ failed to

apply the appropriate legal standards in evaluating his credibility.[18]  He

---

[18]     Despite the fact that the plaintiff takes issue with the ALJ's rejection of his statements regarding disabling symptomology, in actuality there was little testimony offered at the hearing by the plaintiff to support his claim in this regard.  In answer to the ALJ's questioning regarding his symptoms, plaintiff responded "[d]ifficulty concentrating, depression, anxiety."  AT 310.  There was no elaboration regarding those symptoms or their effect upon his ability to perform work-related functions. When questioned by his counsel later on during the hearing concerning his difficulty in concentrating, plaintiff stated "[i]t was difficult to pay attention to detail with respect to certain functions", further explaining that certain tasks were made more difficult, including "[g]etting groceries, remembering lists of groceries that I had to get."  AT 315-

argues that the ALJ reached his conclusion regarding the issue without

evaluating the full set of factors enumerated in 20 C.F.R. §

416.929(c)(3)(i)-(vii).  The Commissioner maintains that the ALJ's

credibility assessment is sound and supported by substantial evidence.

The Commissioner asserts that plaintiff's full-time work without restriction

during part of the period of time for which he alleges disability severely

undermines his credibility.  The Commissioner also highlights the ALJ's

observation that plaintiff appeared to have delayed his return to work due

to his desire to obtain a disability pension from his previous employer.

An ALJ must take into account subjective complaints of disabling

symptomology in conducting the five step disability analysis.  20 C.F.R. §§

404.1529(a), (d), 416.929(a), (d).  When examining the issue, however,

the ALJ is not required to blindly accept the subjective testimony of a

claimant. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Martone*, 70

F. Supp. 2d at 151 (citing *Marcus*).  Rather, an ALJ retains the discretion

---

16.  It is clear that this testimony related to the period prior to July 2007, when plaintiff became re-employed and that he had no difficulty in concentrating at the time of the hearing.  *See* AT 317 ("Q:  Do you have any difficulty concentrating at this point? A: No, my concentration is okay now.").  In short, it is difficult to assess plaintiff's credibility argument since it does not appear that the ALJ was confronted with a significant credibility issue regarding disabling symptomology.

to evaluate a claimant's subjective testimony, including testimony concerning pain. *See Mimms v. Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984). In deciding how to exercise that discretion, the ALJ must consider a variety of factors which ordinarily would be relevant on the issue of credibility in any context, including the claimant's motivation and the medical evidence in the record. *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL 59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, J. and Smith, M.J.) (citing *Marcus*, 615 F.2d at 27-28). After considering the relevant factors, the ALJ must reach an independent judgment concerning the actual extent of pain suffered and its impact upon the claimant's ability to work. *Sweatman*, 1998 WL 59461, at *5.

When the claimant's testimony concerning the limitations caused by his or her conditions, is consistent with and supported by objective clinical evidence demonstrating that claimant has a medical impairment which one could reasonably anticipate would produce such pain, it is entitled to considerable weight.[19] *Barnett*, 13 F. Supp. 2d at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a). If the claimant's testimony concerning the

---

[19] In the Act, Congress has specified that a claimant will not be viewed as disabled unless he or she supplies medical or other evidence establishing the existence of a medical impairment which would reasonably be expected to produce the pain or other symptoms alleged. 42 U.S.C. § 423(d)(5)(A).

intensity, persistence or functional limitations associated with his or her

pain is not fully supported by clinical evidence, however, then the ALJ

must consider additional factors in order to assess that testimony,

including 1) the claimant's daily activities; 2) the location, duration,

frequency, and intensity of any symptoms; 3) the existence of any

precipitating and aggravating factors; 4) the type, dosage, effectiveness,

and side effects of any medications taken; 5) other treatment received;

and 6) other measures taken to relieve symptoms.  20 C.F.R. §§

404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

   After considering plaintiff's subjective testimony, the objective

medical evidence, and any other factors deemed relevant, the ALJ may

accept or reject a claimant's subjective testimony.  *Martone*, 70 F. Supp.

2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such

testimony is rejected, however, the ALJ must state the basis for doing so

with sufficient particularity to enable a reviewing court to determine

whether those reasons for disbelief were legitimate, and whether the

determination is supported by substantial evidence.  *Martone*, 70 F. Supp.

2d at 151 (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y.

1987)).  Where the ALJ's findings are supported by substantial evidence,

the decision to discount subjective testimony may not be disturbed on

review.  *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588,

591 (2d Cir. 1984).

With respect to the plaintiff's credibility in this case, the ALJ found

that his

> medically determinable impairments could reasonably be
> expected to produce some of the alleged symptoms initially;
> however, the [plaintiff's] statements concerning the intensity,
> persistence and limiting effects of these symptoms are not
> credible to the extent they imposed significant functional
> limitations in [his] ability to understand, remember and carry
> out simple job instructions, respond to supervisors, co-workers
> and usual work situations, deal with changes in a routine work
> setting and maintain attention and concentration, abilities it is
> reasonable to conclude he has maintained since taking his
> current position as a truck driver in July 2007.

AT 28.  The ALJ also noted that the record contained evidence suggesting

that the plaintiff "did not return to work . . . despite having been cleared in

May 2006 and having had a normal mental status examination in August

2006 . . . because to do so would have jeopardized his eligibility for

disability benefits."  AT 27.  As referenced above, Dr. Levine noted that

plaintiff would not return work and was waiting at home while in the

process of obtaining a disability settlement from the City of Syracuse.  *See*

AT 249-52; *see also* AT 128-29.  Based upon his review of the relevant

medical records, the ALJ found that there was a "paucity of medical evidence to suggest that [plaintiff] could not have engaged in the mental demands of work in a job that involved simple tasks and allowed for a low-stress environment."  AT 28.

While the ALJ's recitation of the factors leading him to reject plaintiff's subjective claims is less than comprehensive, it does provide some insight into the basis for his determination, which garners the support of substantial evidence.  In support of his assessment, the ALJ considered plaintiff's daily activities, noting that plaintiff "was able to keep up with daily tasks including cooking, cleaning, laundry and shopping" and also noted that plaintiff socialized with family and friends.  AT 25, 27; *see* AT 85, 87, 89, 94, 218, 312-14.  The ALJ further observed that during the interval between the alleged onset of plaintiff's disability and July 2007, when he sought employment as a truck driver, he was able to care for his four dogs and two cats.  AT 26; *see* AT 85, 313.  In addition, the ALJ noted that plaintiff tended to his personal hygiene and during a typical day watched television.  AT 26; *see* AT 85, 99, 218, 313.  The ALJ further observed that plaintiff is able to drive, AT 27; *see* AT 87, 94, and that in fact plaintiff testified that he drove "maybe 100 miles a week" during the

time period when he was not working.  AT 312.  In addition, the ALJ

pointed out, plaintiff reported that he walked and exercised.  AT 85, 94.

     The ALJ also noted that plaintiff's conflict with the fire department

exacerbated his difficulties in maintaining attention and concentration.  AT

25.  The ALJ did not list plaintiff's medications in his decision, but noted

that the side effects plaintiff experienced were limited to difficulty in

sleeping.  AT 26.  The record is consistent with the ALJ's finding.  Plaintiff

testified that he was taking Lexapro[20] and Risperdal[21] for depression,

Xanax[22] for anxiety and Ambien CR[23] for sleep.  AT 316-17.  Plaintiff

testified that the medications he was taking while he was not working

disrupted his sleep such that it took a "couple of hours" before he could

return to sleep.  AT 311.  He explained that he had difficulty "getting to

---

[20]    Lexapro is a preparation of escitalopram oxalate, a selective serotonin reuptake inhibitor used as an antidepressant.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 654, 1047 (31st ed. 2007).

[21]    Risperdal is a preparation of risperidone, a benzisoxazole derivative used as an antipsychotic agent.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1674 (31st ed. 2007).

[22]    Xanax is a preparation of alprazolam, a short-acting benzodiazepine used as an antianxiety agent in the treatment of anxiety and panic disorders and for short-term relief of anxiety symtoms.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 55, 2113 (31st ed. 2007).

[23]    Ambien is a preparation of zolpidem tartrate, a non-benzodiazepine sedative-hypnotic used in the short-term treatment of insomnia.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 58, 2120 (31st ed. 2007).

sleep" and that he would awaken throughout the night.  AT 317; *see also* AT 85.

After considering the evidence in the record, I find that the ALJ's assessment of plaintiff's credibility is supported by substantial evidence.

## IV.   SUMMARY AND RECOMMENDATION

Based upon a careful review of the record in this case, I find that the ALJ's step one analysis and determination is fully supported, and even if erroneous did not unduly prejudice the balance of his decision.  The ALJ also properly applied the special technique, set forth in 20 C.F.R. §§ 404.1520a(a) and 416.920a(a), appropriately finding that plaintiff met neither the "B" nor "C" criteria of Listing 12.03, 12.04 and/or 12.06, and correctly determining plaintiff's RFC, a finding that is supported by substantial evidence.  In addition, the ALJ properly relied upon the grid to determine the existence of available jobs which plaintiff can perform despite his limitations.  Finally, the ALJ properly rejected plaintiff's subjective complaints of disabling symptomology as not entirely credible, and adequately explained his rationale.  Accordingly, it is hereby

RECOMMENDED, that defendant's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no

disability be AFFIRMED and plaintiff's complaint be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      March 8, 2011
              Syracuse, NY



March 04, 2011

Log in | Register

Search

Other search tools: 🔍 Symptoms | 🔍 Doctors

WebMD® Community
Experts and Others Like You ●

Find us on:


- Find a Drug
- Pill Identifier
- Drugs & Medications A-Z
- Drugs & Medical Conditions
- Drug Basics & Safety
- Latest Drug News
- Drugs Information on Mobile
- Find a Vitamin

## Drugs & Medications - Tylenol-Codeine #3 Oral

| USES | SIDE EFFECTS | PRECAUTIONS | INTERACTIONS | OVERDOSE |
|------|--------------|-------------|--------------|----------|

### TYLENOL-CODEINE #3 ORAL USES

This combination medication is used to help relieve mild to moderate pain. It contains a narcotic pain reliever (codeine) and a non-narcotic pain reliever (acetaminophen). Codeine works in the brain to change how your body feels and responds to pain. Acetaminophen can also reduce a fever.

OTHER USES: This section contains uses of this drug that are not listed in the approved professional labeling for the drug but that may be prescribed by your health care professional. Use this drug for a condition that is listed in this section only if it has been so prescribed by your health care professional.

This medication may also be used to suppress a cough.

### How to use Tylenol-Codeine #3 Oral

Take this medication by mouth as directed by your doctor. You may take this drug with or without food. If you have nausea, it may help to take this drug with food. Ask your doctor or pharmacist about other ways to decrease nausea (such as lying down for 1 to 2 hours with as little head movement as possible).

If you are using a liquid form of this medication, use a medication measuring device to carefully measure the prescribed dose. Do not use a household spoon because you may not get the correct dose. If you are taking the suspension, shake the bottle well before each dose.

The dosage is based on your medical condition and response to treatment. Do not increase your dose, take the medication more frequently, or take it for a longer time than prescribed. Properly stop the medication when so directed.

Pain medications work best if they are used as the first signs of pain occur. If you wait until the pain has worsened, the medication may not work as well.

If you have ongoing pain (such as due to cancer), your doctor may direct you to also take long-acting narcotic medications. In that case, this medication might be used for sudden (breakthrough) pain only as needed. Other non-narcotic pain relievers (such as naproxen, ibuprofen) may also be prescribed with this medication. Ask your doctor or pharmacist if you have any questions about using this product safely with other drugs.

This medication may cause withdrawal reactions, especially if it has been used regularly for a long time or in high doses. In such cases, withdrawal symptoms (such as restlessness, watering eyes, runny nose, nausea, sweating, muscle aches) may occur if you suddenly stop using this medication. To prevent withdrawal reactions, your doctor may reduce your dose gradually. Ask your doctor or pharmacist for more details, and report any withdrawal reactions immediately.

When this medication is used for a long time, it may not work as well. Talk with your doctor if this medication stops working well.

Along with its benefits, this medication may rarely cause abnormal drug-seeking behavior (addiction). This risk may be increased if you have abused alcohol or drugs in the past. Take this medication exactly as prescribed to lessen the risk of addiction.

One ingredient in this product is acetaminophen. Taking too much acetaminophen may cause serious (possibly fatal) liver disease. Adults should not take more than 4 grams (4000 milligrams) of acetaminophen a day. If you have liver problems, consult your doctor or pharmacist for a safe dosage of this medication. Carefully check the labels of all your medicines (such as pain/fever drugs or cough-and-cold products) to make sure they do not also contain acetaminophen. (See also Side Effects section.)

Tell your doctor if your pain persists or worsens.

▸ **What conditions does Tylenol-Codeine #3 Oral treat?**

**Next: Side Effects >**

# Automatic Increases

**Social Security Online**

| www.socialsecurity.gov | Home | FAQs ▾ | Contact Us ▾ | Text Size ▾ | Search |

Office of the Chief Actuary

Automatic Increases

Determinations:
  SGA for blind
  SGA for non-blind disabled

Wage-indexed amounts

 ## Substantial Gainful Activity

To be eligible for disability benefits, a person must be unable to engage in substantial gainful activity (SGA). A person who is earning more than a certain monthly amount (net of impairment-related work expenses) is ordinarily considered to be engaging in SGA. The amount of monthly earnings considered as SGA depends on the nature of a person's disability. The Social Security Act specifies a higher SGA amount for statutorily blind individuals; Federal regulations specify a lower SGA amount for non-blind individuals. Both SGA amounts generally increase with increases in the national average wage index.

**Amounts for 2011**
The monthly SGA amount for statutorily blind individuals for 2011 is $1640. For non-blind individuals, the monthly SGA amount for 2011 is $1000. SGA for the blind does *not* apply to Supplemental Security Income (SSI) benefits, while SGA for the non-blind disabled applies to Social Security and SSI benefits. See historical series of SGA amounts below.

**Trial work period**
After a person becomes eligible for disability benefits, the person may attempt to return to the work force. As an incentive, we provide a *trial work period* in which a beneficiary may have earnings and still collect benefits.

## Monthly substantial gainful activity amounts by disability type

| Year | Blind | Non-blind | Year | Blind | Non-blind | Year | Blind | Non-blind |
|------|-------|-----------|------|-------|-----------|------|-------|-----------|
| 1975 | $200 | $200 | 1990 | $780 | $500 | 2005 | $1,380 | $830 |
| 1976 | 230 | 230 | 1991 | 810 | 500 | 2006 | 1,450 | 860 |
| 1977 | 240 | 240 | 1992 | 850 | 500 | 2007 | 1,500 | 900 |
| 1978 | 334 | 260 | 1993 | 880 | 500 | 2008 | 1,570 | 940 |
| 1979 | 375 | 280 | 1994 | 930 | 500 | 2009 | 1,640 | 980 |
| 1980 | 417 | 300 | 1995 | 940 | 500 | 2010 | 1,640 | 1,000 |
| 1981 | 459 | 300 | 1996 | 960 | 500 | 2011 | 1,640 | 1,000 |
| 1982 | 500 | 300 | 1997 | 1,000 | 500 | | | |
| 1983 | 550 | 300 | 1998 | 1,050 | 500 | | | |
| 1984 | 580 | 300 | 1999 | 1,110 | 700[a] | | | |
| 1985 | 610 | 300 | 2000 | 1,170 | 700 | | | |
| 1986 | 650 | 300 | 2001 | 1,240 | 740 | | | |
| 1987 | 680 | 300 | 2002 | 1,300 | 780 | | | |
| 1988 | 700 | 300 | 2003 | 1,330 | 800 | | | |
| 1989 | 740 | 300 | 2004 | 1,350 | 810 | | | |

[a] $500 amount applied in the first half of 1999.

USA.gov

Privacy Policy  | Website Policies & Other Important Information  | Site Map
Last reviewed or modified October 29, 2010

Need Larger Text?